[Crim. No. 1065.    In Bank.—April 30, 1904.]

## THE PEOPLE, Respondent, v. CHARLES E. PADILLA, Appellant.

CRIMINAL LAW — MURDER — CONSPIRACY TO ROB — TESTIMONY OF CO-DEFENDANTS—IMPROPER CROSS-EXAMINATION.—Upon the separate trial of one of three defendants jointly charged with murder, where the theory of the prosecution was that the murder was committed in pursuance of a conspiracy of the three defendants jointly to rob the deceased and his associate, and the defendant called his co-defendants as witnesses solely to rebut the charge of conspiracy, it was prejudicial error to allow the prosecution to cross-examine the other interested defendants to prove that the murder was committed by the defendant, and that they tried to persuade him not to commit it.

ID.—REBUTTAL—REPORT OF SURGEON'S EVIDENCE AT INQUEST.—It was at least irregular to admit in rebuttal the report of the autopsy surgeon's evidence given at the coroner's inquest, but such irregularity could not prejudice the defendant.

ID.—ERROR IN INSTRUCTION AS TO AIDING AND ABETTING.—An instruction that one who aids *or* abets in a murder is a principal is erroneous. He must both aid *and* abet. But such error cannot be deemed to have actually prejudiced the appellant.

ID.—RECORD UPON APPEAL—REPETITION OF CHARGE.—Where the charge to the jury has been properly certified by the court it is part of the record, and ought not to be again repeated in the bill of exceptions.

APPEAL from a judgment of the Superior Court of Sacramento County and from an order denying a new trial. E. C. Hart, Judge.

The facts are stated in the opinion of the court.

O. G. Hopkins, and R. T. McKisick, for Appellant.

U. S. Webb, Attorney-General, and C. N. Post, Assistant Attorney-General, for Respondent.

BEATTY, C. J.—Charles Lawrence, Augustine Morando, and the appellant, Padilla, were jointly accused of the murder of H. C. McCarty. Padilla demanded and was accorded a separate trial, and having been convicted of murder in the first degree and sentenced to be hanged, brings this appeal

from the judgment and from an order denying his motion for a new trial.

All of the defendants, together with a number of other persons,—white and Indian,—were employed in picking hops on a ranch near the town of Elk Grove, in Sacramento County. The defendants were of mixed Indian and white blood, and Lawrence and Morando were half-brothers. McCarty and another white man named Mize were among the pickers. On the fourth day of September, 1902, they took a horse and cart and went to Elk Grove for the purpose of buying some supplies for their camp. Among other things, they bought two bottles of port and a gallon of white wine. Returning with these things, they arrived at the gate leading into the hop-field about sunset, or a little later. Just outside of the gate they met Morando and the appellant, Padilla. According to the testimony of Mize, he and his companion were at this time perfectly sober. The Indians (Morando and Padilla), he says, were drunk, and rudely demanded some of the wine which they saw in the cart. Considering the tone in which the demand was made, he and McCarty thought it prudent to comply, and they produced a bottle of the port, from which they each took a drink. About this time Lawrence rode up on horseback from the direction of the hop-field, and Padilla demanded that he too be given a drink. Lawrence dismounted and the bottle was handed to him. After drinking he stood leaning on the wheel of the cart on the left side next to Mize, while Padilla and Morando stood on the right next to McCarty. While the parties were in this position Padilla said, "You have got some wine there, we want all of it." In the act of protesting against this demand, Mize says he lost consciousness and remembers nothing that then ensued. About midnight he partially regained his senses, and wandered about until daylight without finding his camp. His condition, when found, was such as to show that he had received a heavy blow on the back of his head, and that he had been otherwise badly beaten about the head and face. McCarty's dead body was found early next morning lying in the road near the spot where the parties had met outside of the gate to the hop-field. He too had been brutally beaten about the head and face, besides being shot through the head.

There is no denial, but, on the contrary, an express admis-

sion, on the part of appellant and his co-defendants of their meeting with Mize and McCarty, but they give a different account of what ensued. They insist that Mize and McCarty were drunk, and invited them to drink. That they drank repeatedly, and finally got into a quarrel, caused by grossly abusive epithets applied by McCarty to them; that the quarrel ended in a fight, in the course of which Padilla (according to Lawrence and Morando) or Morando (according to Padilla) shot McCarty. Besides what has been stated, there is in the record much other evidence of an incriminating character, all tending to prove the guilt of the three defendants, and of Padilla in particular, but this evidence comes principally from the half-brothers,—Lawrence and Morando,—who, in attributing the murder to Padilla, endeavor to screen themselves, Lawrence especially making the claim that his efforts throughout were all directed to stopping the fight and protecting Mize and McCarty from the murderous designs of Padilla. It is this feature of the case that occasioned the rulings of the trial judge which are now urged as the principal grounds for reversing the judgment and order appealed from.

The theory of the prosecution upon which the trial was conducted was, that appellant and his co-defendants, having by some means become apprised of the intention of Mize and McCarty to go to Elk Grove and buy a quantity of wine, entered into a conspiracy to waylay and rob them on their return. In order to prove this conspiracy, evidence was introduced to the effect that Lawrence went to Elk Grove on the 4th of September, lingered about the town until after the arrival of Mize and McCarty, and then returned to the hop-ranch, where he met Morando and appellant; that subsequent to the return of Lawrence, and prior to the homicide, appellant informed one of the hop-pickers that he and Lawrence and Morando had some wine coming and were going up to get it. Upon these and some other circumstances the prosecution founded its theory of a conspiracy to rob, and its contention that all three of the defendants were necessarily guilty of murder in the first degree in causing the death of McCarty while engaged in the robbery, and this notwithstanding one or more of them might have been guiltless of any intent to take life or of any participation in the murderous assault which resulted in the homicide. It is easily seen, therefore, how much

depended in the trial of any one of the defendants upon the conclusion the jury might reach as to the existence of the supposed conspiracy. To rebut the evidence offered by the prosecution on this point the appellant introduced the evidence of a number of witnesses, to the effect that Lawrence went to Elk Grove solely for the purpose of getting medicine for a sick child, and returned to the hop-ranch before Mize and McCarty left on their way to town. In his own behalf he testified that he had no knowledge that Mize and McCarty were going for wine and no expectation of meeting them on the road; that he and his co-defendants had a quantity of wine concealed in the willows near their camp, of which they had been freely partaking during the afternoon, with the result that they were all partially intoxicated; that he and Morando had started together to visit a store on an adjoining ranch for the purpose of buying some small articles of clothing, etc., and while proceeding on that errand accidentally met Mize and McCarty; and that Lawrence, on his way to the pasture where his horse was to be turned out, happened to come up while they were conversing. In short, his testimony was all to the effect that there was no conspiracy to rob and no knowledge of any opportunity to rob; that he and Morando were going upon a perfectly legitimate errand when they accidentally met deceased and his companion; that Lawrence, also in the prosecution of a legitimate errand, and without any concert with them, happened to come up and join in the drinking at the invitation of Mize and McCarty. Having thus met the charge of conspiracy, he went on to testify regarding the sudden quarrel, which he says arose after the drinking had continued for some time, and its fatal result. As to this matter, his testimony was to the effect that Morando, abetted by Lawrence, did the killing in spite of his effort to prevent it. From this statement it will be seen that the defense embraced two distinct and vitally important points—1. That there was no conspiracy to rob; and 2. That in the quarrel provoked by deceased, and the resulting combat, appellant, so far from being a participant, was acting as a peacemaker. To support his defense on the first point the appellant called as witnesses his co-defendants, Lawrence and Morando, and in his direct examination elicited nothing that was not strictly and exclusively relevant to that branch of the case. His motive in so

restricting the examination is self-evident. Supposing there was no conspiracy, he could make Lawrence and Morando his witnesses with perfect confidence that they would tell the truth in order to exonerate not only him but themselves, while as to the other part of his defense he knew that they would be under the strongest temptation to screen themselves by imputing the guilt of the murder to him.

But notwithstanding the strictly limited examination in chief of these interested witnesses, the court, over the repeated objection of the appellant, permitted the prosecution, on cross-examination, to bring out their account of the quarrel and affray, in which, as was to be expected, they represented appellant as the murderer and themselves as the peacemakers.

The ruling of the court in permitting this course of cross-examination was erroneous and necessarily prejudicial to the appellant.

The rule as to cross-examination is embodied in section 2048 of the Code of Civil Procedure as follows: "The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected therewith, and in so doing may put leading questions, but if he examine him as to other matters, such examination is to be subject to the same rules as a direct examination."

This rule, of course, admits the putting of any questions properly framed for the purpose of testing the memory of the witness, his means of knowledge, his accuracy, his bias, or his credibility, but it would have no meaning and would afford no protection if a hostile witness called to a particular matter could, in order to test his memory, etc., be fully examined by the adverse party upon other and distinct features of the case, under the claim and under the ruling that he was being cross-examined upon matters called out in chief. Of course, the prosecution might have been allowed, in the discretion of the court, to reopen their case and to make these witnesses their own for the purpose of proving what they evidently desired to prove,—viz., that, conspiracy or no conspiracy, appellant was the real murderer. But they did not take this course; they insisted, and the court was induced to hold, that they were only pursuing a legitimate line of cross-examination, and they were thus enabled to go to the jury with the claim, sanctioned by the authority of the court, that

by appellant's own witnesses they had established his guilt. That this was a procedure highly prejudicial to a fair trial there can be no doubt.

Other rulings of the trial court are complained of as erroneous and prejudicial. With two slight and unimportant exceptions, we think these rulings were free from error. It was at least irregular to admit in rebuttal the report of the autopsy surgeon's evidence at the inquest, and it was error to instruct the jury that one who aids *or* abets is a principal— he must aid *and* abet. Neither of these errors, however, can be deemed to have actually prejudiced the appellant.

But the latitude of cross-examination permitted in the case of the two interested and hostile witnesses, Lawrence and Morando, was too seriously erroneous and too obviously injurious to be sanctioned as a permissible practice in criminal cases. And since for this reason the judgment and order of the superior court must be reversed, it is wholly unnecessary to consider the ruling as to newly discovered evidence.

Both parties to this appeal comment upon the extreme and unnecessary length of the record, in which the testimony of a large number of witnesses is set out with much repetition and at unnecessary length, and each disclaims responsibility for the fault. We do not, of course, know whose the fault is, but certainly the record is bulkier than necessary, and we may again call attention to the impropriety of repeating in the bill of exceptions the charge of the court, which, when properly certified, as in this case it was, is made by the statute a part of the record in the absence of any bill of exceptions.

The judgment and order of the superior court are reversed.

Lorigan, J., McFarland, J., Henshaw, J., concurred.